ACCEPTED
03-14-00197-CV
5206823
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/8/2015 10:36:16 AM
JEFFREY D. KYLE
CLERK

**NO. 03-14-00197-CV**

_____

IN THE COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

5/8/2015 10:36:16 AM

JEFFREY D. KYLE
Clerk

_____

# GRAPHIC PACKAGING, INC.,
*Appellant*

v.

# GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS; AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS,
*Appellees.*

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT, CAUSE NO. D-1-GN-12-003038, THE HONORABLE DARLENE BYRNE PRESIDING

**AMICI CURIAE BRIEF OF THE INTERSTATE COMMISSION FOR JUVENILES, THE ASSOCIATION OF COMPACT ADMINISTRATORS OF THE INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN, AND JEFFREY LITWAK, IN SUPPORT OF APPELLANT**

RICHARD L. MASTERS
(Kentucky Bar No. 44606)
lawsaver@aol.com
**MASTERS, MULLINS & ARRINGTON**
1012 South Fourth Street
Louisville, Kentucky 40203
Tel: (502) 582-2900
Fax: (502) 587-0931

ATTORNEYS FOR AMICI
CURIAE INTERSTATE
COMMISSION FOR JUVENILES
& ASSOCIATION OF COMPACT
ADMINISTRATORS OF THE
INTERSTATE COMPACT ON THE
PLACEMENT OF CHILDREN

JEFFREY B. LITWAK
(Oregon Bar No. 973170)
jlitwak@alum.mit.edu
1608 NE Knott Street
Portland, Oregon 97212
(503) 777-4758

ATTORNEYS FOR AMICUS
CURIAE JEFFREY LITWAK

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES .............................................................................ii

I.    IDENTITY AND INTEREST OF AMICI ...................................... 1

    The Interstate Commission for Juveniles..................................... 1

    The Association of Administrators of the Interstate Compact on the
      Placement of Children ................................................................. 1

    Statement of Interest of the Compact Amici ............................... 3

    Jeffrey B. Litwak and Statement of Interest ............................... 4

    Disclosure Pursuant to Texas Rule of Appellate Procedure 11(c) ............... 6

II.    INTRODUCTION .................................................................... 6

III.    HISTORICAL OVERVIEW ...................................................... 11

    A.  Interstate Compacts Are Widely Used to Define Legal Relationships
        Among States .................................................................... 11

    B.  The Core Legal Principles that Govern Interstate Compacts .......... 13

    C.  Compacts Provide Uniformity Through the Collective Exercise of
        Sovereignty by the Member States ................................... 18

    D.  The Implications of Congressional Consent (or its Absence) ......... 19

IV.    ANALYSIS OF THE MULTISTATE TAX COMPACT AS A COMPACT
    REQUIRES ITS CONTRACTUAL NATURE TO PREVAIL.................. 20

V.    THE DECISION OF THE TRIAL COURT SERIOUSLY UNDERMINES
    THE ENFORCEMENT OF OTHER COMPACTS ENACTED BY TEXAS
    .................................................................................................. 29

VI.    CONCLUSION.................................................................................. 31

CERTIFICATE OF COMPLIANCE................................................................. 33

CERTIFICATE OF SERVICE ......................................................................... 34

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alabama v. North Carolina,*
130 S Ct 2295; 176 L Ed 2d 1070 (2010) ............................................... 7, 25

*Burns v. United States*,
501 U.S. 129 (1991) ................................................................................ 25

*Cal. Dep't of Transp. v. City of S. Lake Tahoe*,
466 F. Supp. 527 (E.D. Cal. 1978) ......................................................... 28

*CT Hellmuth v. Washington Metro Area Trans Auth,*
414 F Supp 408 (D Md, 1976) .............................................................. 6, 16

*Cuyler v. Adams*,
449 US 433; 101 S Ct 703; 66 L Ed 2d 641 (1981) ................................ 19

*Delaware River Joint Toll Bridge Comm v. Colburn*,
310 U.S. 419; 60 S Ct 1039; 84 L Ed 1287 (1940) ...................... 19, 26, 27

*Doe v. Ward,*
124 F Supp 2d 900 (WD Pa, 2000) ...................................................... 6, 16

*Entergy Arkansas, Inc. v. Nebraska*,
358 F.3d 528 (8th Cir. 2004) .............................................................. 16, 30

*Ex Parte Cantrell*,
362 S.W.2d 115 (Tex. Crim. App. 1962) ................................................. 23

*Green v. Biddle,*
21 US (8 Wheat) 1; 5 L Ed 547 (1823) ................................................ 7, 14

*Hess v. Port Authority Trans-Hudson Corp.*,
513 U.S. 30 (1994) .................................................................................. 18

*Hinderlider v. La Plata River and Cherry Creek Ditch Co,*
304 US 92; 58 S Ct 803; 82 L Ed 1202 (1938) ....................................... 17

*In re Texas*,
  97 S.W.3d 744 (Tex. App.—El Paso 2003, no pet.) ................................. 23

*McComb v. Wambaugh*,
  934 F.2d 474 (3rd Cir. 1991), *overruled on other grounds by*
  *State Dep't of Econ. Sec. v. Leonardo,*
  22 P.3d 513 (Ariz. Ct. App. 2001) .................................................... 2, 6, 15

*Nebraska v. Central Interstate Low-Level Radioactive Waste Comm*,
  207 F3d 1021 (CA 8, 2000)................................................................. 15

*New Jersey v. New York,*
  523 US 767, 118 S Ct 1726 (1998) ...................................................... 7, 20

*Oklahoma v. New Mexico*,
  501 U.S. 221 (1991) ............................................................................. 25

*Potomac Shores, Inc. v. River Riders, Inc.*,
  98 A.3d 1048 (Md. Ct. Spec. App. 2014) ................................................ 13

*Seattle Master Builders Ass'n v. Pac Northwest Elec Power Planning*
  *Council*, 786 F2d 1359 (CA 9, 1986)....................................... 7, 14, 27, 28

*Skamania County v. Woodall*,
  16 P.3d 701 (Wash. Ct. App. 2001) ....................................................... 27

*State of Illinois Dept. of Public Aid v. Schweiker*,
  707 F. 2d 273, 277 (CA7 1983) .............................................................. 25

*Tarrant Reg'l Water Dist. v. Hermann*,
  186 L. Ed. 153 (2013) ...................................................................... 24, 25

*Texas v. New Mexico,*
  462 US 554, 103 S Ct 2558 (1983) ............................................... 7, 20, 25

*Texas v. New Mexico,*
  482 U.S. 124 (1987) .............................................................................. 16

*US Steel Corp v. Multistate Tax Comm,*
    434 US 452; 98 S Ct 799; 54 L Ed 2d 682 (1978)............................ passim

*US Trust Co v. New Jersey*,
    431 US 1 (1977) ................................................................................. 14

*Virginia v. Tennessee,*
    148 US 503; 13 S Ct 728; 37 L Ed 537 (1893) ......................................... 19

*West Virginia ex rel Dyer v. Sims*,
    341 US 22; 71 S Ct 557; 95 L Ed 713 (1951) .................................... passim

*Wroblewski v. Commonwealth*,
    570 Pa 249; 809 A2d 247 (Pa 2002) ......................................................... 15

## STATUTES

Alaska Stat. § 43.19.010 ................................................................................. 22

Haw. Rev. Stat. § 255-1 ................................................................................... 22

Idaho Code Ann. § 63-3027 .............................................................................. 22

Idaho Code Ann. § 63-3701 .............................................................................. 22

Interstate Compact on the Placement of Children, MCL 3.711 ............. 1, 2, 3

Kan. Stat. Ann. § 79-4301 ............................................................................... 23

Missouri-Nebraska Boundary Compact, PL 106-101, 113 Stat. 1333 (1999)

    ....................................................................................................................... 12

Mo. Rev. Stat. § 32.200 ................................................................................... 23

Mont. Code Ann. § 15-1-601 ........................................................................... 23

N.M. Stat. Ann. § 7-5-1 ................................................................................... 23

Tex. Agric. Code §§ 79.001-79.007 ................................................................. 10

Tex. Educ. Code §§ 160.01-160.04 ................................................................ 10

Tex. Educ. Code §§ 161.01-161.04 .................................................................. 9

Tex. Educ. Code §§ 162.001-162.005 .............................................................. 9

Tex. Fam. Code §§ 162.101-162.107 ................................................................ 9

Tex. Fam. Code §§ 60.001-60.012 .................................................................... 9

Tex. Ins. Code §§ 5001.001-5000.002 .............................................................. 9

Tex. Nat. Res. Code §§ 141.001-141.005 ........................................................ 10

Tex. Occ. Code §§ 304.101-304.109 ............................................................... 10

Tex. Tax Code § 140.001 ................................................................................. 7

Tex. Tax Code §§ 141.101-141.106 ................................................................ 10

Tex. Transp. Code §§ 523.001-523.011 ............................................................ 9

Wash. Rev. Code § 82.56.010 ........................................................................ 23

## CONSTITUTIONAL PROVISIONS

Compact Clause ....................................................................................... *passim*

Contracts Clause ............................................................................. 15, 16, 17

US Const, art I, §10, cl 1 .............................................................................. 13

US Const, art I, §10, cl 3 .......................................................................... 11, 19

US Const, art VI, cl 2 ................................................................................... 14

## OTHER AUTHORITIES

Caroline N. Broun, et al., *The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide* (ABA, 2006) .............. *passim*

v

Barnett, *A Consent Theory of Contract*, 86 Columbia L Rev 269 (1986).... 30

Frankfurter & Landis, *The Compact Clause of the Constitution − A Study in Interstate Adjustments*, 34 Yale L.J. 685 (1921)........................................ 11

Garfield, *Promises of Silence: Contract Law and Freedom of Speech*, 83 Cornell L Rev 261 (1998) ....................................................................... 30

Litwak, *Interstate Compacts: Cases and Materials* (Semaphore Press 2012) ............................................................................................. 5, 13, 17

Michael Buenger & Richard Masters, *The Interstate Compact on Adult Offender Supervision: Using Old Tools to Solve New Problems*, 9 Roger Williams U. L. Rev. 71 (2003)........................................................... *passim*

# I. IDENTITY AND INTEREST OF AMICI

## The Interstate Commission for Juveniles

The Interstate Commission for Juveniles is the interstate governing body created under the Interstate Compact for Juveniles ("ICJ") to oversee the administration and enforcement of the compact. The ICJ is the only state or federal law which provides the legal authority to transfer supervision of juveniles under parole or probation supervision or to allow the apprehension and safe return of juvenile runaways and absconders across state lines of the member states. Fifty-one jurisdictions have enacted the ICJ, including Texas. The ICJ's purposes include providing a means of joint and cooperative action among the compacting states to ensure that adjudicated juveniles are provided adequate supervision and services in the receiving state as ordered by the adjudicating judge or parole authority in the sending state. The Interstate Commission for Juveniles has no financial interest in the outcome of this case and, by and through its Executive Committee, has authorized the filing of this amicus brief.

## The Association of Administrators of the Interstate Compact on the Placement of Children

The Interstate Compact on the Placement of Children ("ICPC") was established in 1974 and consists of members from all 50 states, the District

1

of Columbia and the United States Virgin Islands. The Association of Administrators of the Interstate Compact on the Placement of Children ("AAICPC") has authority under ICPC to "promulgate rules and regulations to carry out more effectively the terms and provisions of this compact." The ICPC was prompted by concerns regarding states' inability to protect the welfare of children once they are moved across a state border. It was drafted to promote state cooperation ensuring safe and timely placement in a suitable environment with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

The AAICPC has a significant interest in promoting the uniform interpretation and application of the compact for the protection of child welfare. The decision below could serve as justification for member states to deviate unilaterally from their policies and procedures for ensuring that children will be protected when they are sent out of state.[1] Like the ICJ, the compact's effectiveness as a contract among the states necessarily depends upon its uniform application by its member states, each of which is contractually bound to abide by its terms. For that very reason, the ICPC

---

[1] *McComb v. Wambaugh*, 934 F.2d 474, 479 (3d Cir. 1991) ("uniformity of interpretation [of the ICPC by member states] is important").

2

was adopted as a compact – a binding contract – between the states rather than as a uniform law (such as the Uniform Commercial Code), which each state would otherwise be free to interpret differently. The AAICPC has no financial interest in the outcome of this case and through its Executive Committee has authorized the filing of this amicus brief.

## Statement of Interest of the Compact Amici

The Compact Amici are "creations" of the respective state legislatures' grant of authority, as set forth in the language of their respective compact statutes. In the case of the ICJ, this authority is exercised as the only state or federal law of its kind to regulate the interstate transfer and return of delinquent juveniles under parole or probation supervision, as well as runaways. In the case of the ICPC, such authority serves the interest of the member states in the protection of child welfare by regulation of the interstate movement and safe placement of children between states when the children are in the custody of a state, being placed for private or independent adoption, or under certain circumstances, being placed by a parent or guardian in a residential treatment facility.

Thus the Compact Amici have a vested interest in this matter, given that the lower court's decision effectively allows Texas, or by extension of its logic, any other compact member state, unilaterally to contravene the

3

uniform requirements of, not just the Compact, but other interstate compacts which Texas has enacted. This impermissible allowance of a unilateral amendment of the terms of an interstate compact by one member state has serious implications not only for the Appellant, but also for the other interstate compacts represented herein and other compacts across the nation, whose authority to regulate such matters as juvenile offender transfers and child welfare placements is dependent upon the validity of the uniform provisions of these respective compacts. Without the assurance of uniform compliance and enforcement of these compacts, the entire system of interstate placement of children and both the transfer of juvenile probation and parole supervision as well as the appropriate apprehension and return of runaways and absconders will be threatened. If states are permitted to unilaterally reject such interstate transfers in violation of compact and code provisions, both child welfare and public safety will be endangered.

## Jeffrey B. Litwak and Statement of Interest

Jeffrey B. Litwak is an Adjunct (and previously Visiting) Professor of Law at Lewis and Clark Law School, where he developed and has taught the country's only law school course focused on interstate compact law since 2004. *See Law Courses Catalog, Interstate Compacts Seminar*, available at http://legacy.lclark.edu/dept/lawreg/law365.html (last visited Apr. 20, 2015)

(course description).  Professor Litwak has also served as in-house general counsel to an interstate compact entity, the Columbia River Gorge Commission (a compact between Oregon and Washington) since 1999, arguing numerous compact law issues in the states' courts.  Professor Litwak has studied and speaks nationally about the prohibition against applying state law that conflicts with an interstate compact, and has written the only law school text on interstate compact law, Jeffrey B. Litwak, *Interstate Compacts: Cases and Materials* (v. 2.0 2014), and numerous chapters on interstate compact law in Oregon, Washington, and American Bar Association books.

Professor Litwak submits this amicus brief *pro se*, representing no institution, entity, group, or association; none of the entities with which he is associated has provided any technical or research assistance, time, funding, use of facilities, or any other assistance.  He has no personal or financial interest in the outcome of this matter.

Professor Litwak has a professional scholarly interest in the law of interstate compacts.  He is interested in the consistent application of existing compact law to the interpretation of interstate compacts and in the orderly and predictable development of compact law.  He also uses current events and litigation as teaching tools and would use this matter as such.  In short,

Professor Litwak presents the law in this brief from a disinterested perspective, which happens to align with the Appellant's interests in this matter.

**Disclosure Pursuant to Texas Rule of Appellate Procedure 11(c)**

The following entities paid for the preparation and filing of this brief: H.J. Heinz Company & Subsidiaries; Tempur-Sealy International, Inc. & Subsidiaries (formerly known as Tempur-Pedic International, Inc. and Subsidiaries); Brown-Forman Corporation and Subsidiaries; Amphenol Corporation and Subsidiaries; Gillette Commercial Operations of North America, Inc.; and National Beef Packing Company, LLC.

## II.    INTRODUCTION

The instant action presents a fundamental issue of interstate compact law, namely, whether a state may apply subsequently enacted legislation that conflicts with an interstate compact's provisions.  Due to their unique status as both statutes *and* agreements among sovereign states, a member state cannot unilaterally amend an interstate compact.  Rather, interstate compacts supersede conflicting state law.  *See, e.g.*, *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 24 (1951); *McComb*, 934 F.2d at 479; *C.T. Hellmuth & Assocs., Inc. v. Wash. Metro. Area Transit Auth.*, 414 F. Supp. 408, 409 (D. Md. 1976); *Doe v. Ward*, 124 F. Supp. 2d 900, 914–15 (W.D. Pa. 2000); and

other cases discussed below. The Supreme Court has directed that an interstate compact's express terms must be respected:

> We are especially reluctant to read absent terms into an interstate compact given the federalism and separation-of-powers concerns that would arise were we to rewrite an agreement among sovereign States, to which the political branches consented. As we have said before, we will not "order relief inconsistent with [the] express terms of a compact, no matter what the equities of the circumstances might otherwise invite."

*Alabama v. North Carolina*, 560 U.S. 330, 352 (2010) (quoting *New Jersey v. New York*, 523 U.S. 767, 811 (1998) and *Texas v. New Mexico*, 462 U.S. 554, 564 (1983)); *see also Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power Planning Council*, 786 F.2d 1359, 1371 (9th Cir. 1986). Further, the Contract Clause is a bedrock provision of the United States and Texas Constitutions, which prevents any compact state from "impairing the obligation of contracts," including compacts. *See Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 9, 89–91 (1823). The trial court failed to properly analyze and apply these core principles of compact law in this case. This Court should thus reverse the trial court's granting of the Appellees' motion for summary judgment and the denial of Appellant's cross motion and conclude that Appellant could properly use the apportionment formula in the Multistate Tax Compact ("Compact"), as codified in Tex. Tax Code § 140.001.

As explained herein, it is the statutory and contractual nature of interstate compacts that allows compact states to achieve enforceable uniformity among all member states, while preserving their 'collective sovereignty' in addressing supra-state problems. Caroline N. Broun, et al., *The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide* 2–3 (ABA, 2006). Therefore, interstate compacts serve a crucial function in our increasingly complex society. They are the only formal mechanism by which individual states can reach beyond their borders and collectively regulate the conduct of other states and the citizens of other states.

Amici write only to address the binding nature of express language in interstate compacts generally and the Compact specifically. Amici do not address whether the Compact election specifically applies to the Texas Franchise Tax.

The trial court's decision—in failing to grapple with the compact law issues—jeopardizes the vitality of the interstate compacts Texas has enacted. This court's decision will thus have broader interest beyond this case and

beyond the Compact.  Texas is a party to at least 27 interstate compacts (including the Compact).[2]

Appellant correctly briefed that the lack of congressional consent for the Compact does not change the fundamental prohibition against states unilaterally amending a compact.  Appellant's Brief at 34–36.  In contrast, Appellees argued that compacts that do not require congressional consent *may* be binding, depending on the state's actions.  Appellees' Brief at 62–64.  As Amici explain below, Appellees' argument does not recognize the fundamental nature and position of compacts in the United States.  If the Court concludes that Appellees are correct, then at least eleven interstate compacts that Texas is a party to that do not require congressional consent may or may not be binding, including:

- Compact on Education (Tex. Educ. Code §§ 161.01-161.04)
- Driver's License Compact (Tex. Transp. Code §§ 523.001-523.011).
- Interstate Compact on Educational Opportunity for Military Children (Tex. Educ. Code §§ 162.001-162.005)
- Interstate Insurance Product Regulation Compact (Tex. Ins. Code §§ 5001.001-5000.002)
- Interstate Compact for Juveniles (Tex. Fam. Code §§ 60.001-60.012)
- Interstate Compact on the Placement of Children (Tex. Fam. Code §§ 162.101-162.107)

---

[2] *See* Council of State Governments National Center for Interstate Compacts Database, http://apps.csg.org/ncic/ (On the map, click on the state of Texas).

9

- Interstate Pest Control Compact (Tex. Agric. Code §§ 79.001-79.007)
- Natural Resources and Water Resources Compact (Tex. Nat. Res. Code §§ 141.001-141.005)[3]
- Nurse Licensure Compact (Tex. Occ. Code §§ 304.101-304.109)
- Multistate Tax Compact (Tex. Tax Code §§ 141.101-141.106)
- Southern Regional Education Compact (Tex. Educ. Code §§ 160.01-160.04)

No compact should be "maybe binding." Other states will think twice before entering into compacts with Texas if Texas does not consider itself bound to its agreements with other states.

A decision allowing a party state to enact subsequent legislation to change the terms under which Texas participates in the Compact could affect the way other states view Texas' commitment to other vital interstate compacts and could impact any compact in any state. This is so because courts routinely cite to compact cases and compact law principles from other states; thus a decision upholding the trial court's determination from this court will provide judicial precedent no matter what court or compact is involved. Each court decision involving a compact is important. The briefs in this matter aptly demonstrate this point by citing authority involving multiple compacts from multiple courts.

---

[3] The Natural Resources and Water Resources Compact may not be effective at this time. None of the other eligible party states have this compact in their statutes.

## III. HISTORICAL OVERVIEW

This case is first and foremost a case concerning the legal nature of interstate compacts. Interstate compacts have been used throughout United States history to contractually control relationships between and among states and with the federal government on a broad range of issues. *See* Michael Buenger & Richard Masters, *The Interstate Compact on Adult Offender Supervision: Using Old Tools to Solve New Problems*, 9 Roger Williams U. L. Rev. 71, 73, 79–83 (2003).

### A. Interstate Compacts Are Widely Used to Define Legal Relationships Among States

The Compact Clause of the United States Constitution provides that "No State shall, without the Consent of Congress, . . . enter into any Agreement of Compact with another State . . ." U.S. Const. art. I, § 10, cl. 3. Originally used for resolution of inter-colonial boundary disputes, the Compact Clause has undergone a significant transformation since. *See* Buenger & Masters, *supra*; Felix Frankfurter & James Landis, *The Compact Clause of the Constitution − A Study in Interstate Adjustments*, 34 Yale L.J. 685, 691–95 (1921). While interstate compacts predate the United States Constitution, their use as ongoing governing mechanisms has been a development of the twentieth and twenty-first centuries. Before the

11

twentieth century, interstate compacts were used almost exclusively to settle boundary disputes or adjust jurisdictional lines. States continue to use compacts to settle land claims between states, as Missouri and Nebraska did in 1999. Missouri-Nebraska Boundary Compact, Pub. L. 106-101, 113 Stat. 1333 (1999) (resolving boundary and related issues of criminal and civil court jurisdiction, taxes, and riparian rights). More recently, however, states have used compacts to manage a wide array of regional and national problems, including natural and water resource management, pollution control, regional economic development, crime control, child welfare, education, emergency management, waste disposal, transportation, professional licensing, taxation, etc. *See* Broun, *supra*, at xvi–xvii.

Today there are more than 200 compacts in place. Compacts are one of the only formal mechanisms by which individual states can, through legislation, reach beyond their borders and collectively regulate the conduct of other states and other states' residents. Compacts are thus appropriately described as instruments that regulate matters that are sub-federal, supra-state in nature. *See* Buenger & Masters, *supra*, at 77. For this reason, it is crucial that states, which are parties to a given compact, can rely upon the express terms of the compact to bind the other member states to achieve the states' uniform purposes. This includes the reasonable expectation that the

12

only "escape" from compact obligations is withdrawal as provided by the agreement's terms. Indeed the long-term binding relationship between states that interstate compacts create is aptly demonstrated by a 2014 decision from the Maryland Court of Special Appeals applying the very first interstate compact, the Maryland-Virginia Compact of 1785, which *still* regulates fishing and navigation on Chesapeake Bay and the Potomac River. *Potomac Shores, Inc. v. River Riders, Inc.*, 98 A.3d 1048 (Md. Ct. Spec. App. 2014).

**B. The Core Legal Principles that Govern Interstate Compacts**

Understanding the legal status of an interstate compact begins with this basic point: Interstate compacts are *formal agreements between states* that are both (1) statutory law, and (2) interstate contractual agreements. Litwak, *supra*, at 15. They are enacted by state legislatures adopting reciprocal laws that substantively mirror one another, which gives a compact its contractual nature. There is (1) an offer (the presentation of a reciprocal law to two or more state legislatures), (2) acceptance (the actual enactment of the law by two or more state legislatures), and (3) consideration (the settlement of a dispute or creation of a regulatory scheme). Buenger & Masters, *supra*, at 93–98. Due to the fundamental nature of a compact as a contractual agreement as well as a statute, the enforcement of compacts is controlled by the Contract Clause (*see* U.S. Const. art. I, § 10, cl. 1) and, to a

13

lesser extent, by the Supremacy Clause (U.S. Const. art. VI, cl. 2), among other authorities, depending on the substantive nature of the compact and its impact on the basic principles of federalism.

A compact is not a "uniform law" as that term is typically construed and applied. Compacts, unlike laws such as the Uniform Commercial Code or the Uniform Criminal Extradition and Rendition Act, are not subject to unilateral amendment by a state. Once adopted, a state cannot modify the compact unless the language of the agreement authorizes such an act, and even then only as provided in the agreement. This has been the most basic principle of compacts since the very first compact case in 1823, *Green*, 21 U.S. at 89–91, in which the Supreme Court concluded that Kentucky could not apply new state law in contravention to the Virginia-Kentucky Compact of 1789, which preserved the application of Virginia law. Since then, courts have consistently held that one state may not apply its own state law to a compact when that law conflicts with the express terms of a compact. A few of the many more recent cases to similarly hold compacts to be binding are:

- *U.S. Trust Co. v. New Jersey*, 431 U.S. 1 (1977) (Contract Clause applied to state's obligation to bondholders in connection with interstate compact);
- *Seattle Master Builders*, 786 F.2d at 1371 (stating "A state can impose state law on a compact organization only if the compact specifically reserves its right to do so.");

14

- *McComb*, 934 F.2d at 479 ("Having entered into a contract, a participant state may not unilaterally change its terms. A Compact also takes precedence over statutory law in member states.").
- *Nebraska v. Central Interstate Low-Level Radioactive Waste Comm'n*, 207 F.3d 1021, 1026 (8th Cir. 2000) (holding that Nebraska did not have the unilateral right to exercise a veto over actions of an interstate commission created by a compact);
- *Wroblewski v. Commonwealth*, 809 A.2d 247 (Pa. 2002) (terms of an interstate compact contain the substantive obligations of the parties as is the case with all contracts; Contracts Clause of the Federal Constitution protects compacts from impairment by the states; although a state cannot be bound by a compact to which it has not consented, an interstate compact supersedes prior statutes of signatory states and takes precedence over subsequent statutes of signatory states).

The law is clear. No state or state official can act in conflict with the terms of a compact. Compacts are one of the few exceptions to the general rule that a sitting state legislature cannot bind future state legislatures. *See* Broun, *supra*, at 17, 20.

By entering a compact, the member states contractually agree that the compact's terms and conditions supersede parochial state considerations. Compacts create collective governing tools to address multilateral issues and, as such, they govern based upon the *collective will* of the member states, not the will of any single member state. Broun, *supra*, at 28–29. Compact law has developed as described above to preserve this *raison-d'etre* for compacts. Had courts allowed states to renege on their compacts over the past 200 years of compact disputes, states would have had no

reason to enact new compacts and the Compact Clause would have become a dead letter.

Appellees incorrectly argue that there is no principled reason why a state law cannot abrogate a compact that does not require consent, independent of the Contracts Clause. Appellees' Brief at 64. The Eighth Circuit explained the unique nature of interstate compacts as compared to other forms of contract.

> While a common law contract directly affects only the rights and obligations of the individual parties to it, an interstate compact may directly impact the population, the economy, and the physical environment in the whole of the compact area. A suit alleging that a state has breached an obligation owed to its sister states under a congressionally approved interstate compact also raises delicate questions bearing upon the relationship among separate sovereign polities with respect to matters of both regional and national import.

*Entergy Arkansas, Inc. v. Nebraska*, 358 F.3d 528, 542 (8th Cir. 2004) (citations omitted). Compacts are also a special kind of contract because they are also reciprocal state laws. *See* Broun, *supra*, § 1.1 at 17-24; *Texas v. New Mexico,* 482 U.S. 124, 128 (1987); *Hellmuth*, 414 F. Supp. at 409; *Doe v. Ward*, 124 F. Supp. 2d at 914–15. Compacts are also unique because they are a tool for states to collectively reach beyond their borders and regulate the conduct of other states' residents. Compacts serve this function regardless of whether they have received consent. Thus a decision holding

16

the Compact not binding in Texas affects persons regulated in the other party states—by adding additional local constraints on regulated persons that other party states have not agreed to, or by releasing regulated persons from obligations locally that other party states believe are binding. Because interstate compacts are unlike garden-variety contracts in these unique ways, there is a unique basis for enforcing compacts, beyond the Contracts Clause.

The authority for the 50 states to enter into binding compacts, and authority for state courts to enforce compact terms, is unique. No other federalist nation's constitution specifically provides such authority to its "state" governments. So important is this element of American government that the Supreme Court would not allow West Virginia to interpret a provision of its own state constitution so as to avoid its obligations under the Ohio River Valley Water Sanitation Compact, *Dyer*, 341 U.S. at 30–31, or allow Colorado to apply its own constitutional water appropriation rights in a manner conflicting with the La Plata River Compact, *Hinderlider v. La Plata River and Cherry Creek Ditch Co*, 304 U.S. 92 (1938) (overruled on other grounds). And several other federal and state courts have held the same. Litwak, *supra*, at 73–74 (citing cases).

## C. Compacts Provide Uniformity Through the Collective Exercise of Sovereignty by the Member States

In effect, by agreeing to a compact, member states contractually cede a portion of their individual jurisdiction, sovereignty, and authority over the compact's subject matter in favor of governing principles that apply collectively to all member states. This cession of sovereign authority is a vital consideration in determining whether an interstate agreement rises to the level of an enforceable interstate compact. It is a concession to all member states that an individual state cannot subsequently alter absent an outright repeal of the agreement (if permitted) or the consent of all other member states. By enacting the compact statute, the member states contractually agree on certain principles and rules concerning the exercise of joint governing authority over the subject matter of the compact. As noted in *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 42 (1994), "[a]n interstate compact, by its very nature, shifts a part of a state's authority to another state or states, or to the agency the several states jointly create to run the compact."

In the adoption of many administrative compacts, including the ICJ and the ICPC, member states have collectively and contractually agreed to reallocate governing authority away from individual states to a multilateral relationship defined by commonly accepted principles. States may reclaim

18

the sovereignty they ceded by withdrawing from or repealing the compact as provided by the agreement's terms. Self-help through later-enacted legislation is not permitted.

**D. The Implications of Congressional Consent (or its Absence)**

Where required, the nature of a compact changes significantly once Congress grants its consent. Consent transforms an interstate compact into the "law of the United States." *See Cuyler v. Adams*, 449 U.S. 433, 440 (1981). Although *Cuyler* is the most common citation for this rule, the rule has been settled law for 75 years. *See Del. River Joint Toll Bridge Comm'n v. Colburn*, 310 U.S. 419, 427 (1940) ("[W]e now conclude that the construction of such a compact sanctioned by Congress by virtue of Article I, § 10, Clause 3 of the Constitution, involves a federal 'title, right, privilege or immunity'[.]").

The Compact Clause's express language could lead to the conclusion that any compact agreement between two or more states requires congressional consent. However, only compacts that intrude upon the power of the federal government or alter the political balance between the states and the national government require Congressional consent. *See U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452 (1978); *Virginia v. Tennessee*, 148 U.S. 503 (1893). The grant of consent is an act of political

19

judgment by Congress and the above-referenced constraints maintain the political balance between the federal government and the states, unless Congress wishes otherwise. To the extent that a compact does not shift the balance or intrude on federal interests, congressional consent is unnecessary.

Importantly, no court has ever held that a compact not requiring congressional consent is not an enforceable agreement between the member states. The corollary, that compacts are enforceable contracts regardless of consent, is the state of the law today. In interpreting and enforcing compacts, the courts are constrained to effectuate the express terms and only the express terms of the agreement. *See New Jersey v. New York*, 523 U.S. at 810, 912. Consequently, "no court may order relief inconsistent with its express terms." *Texas v. New Mexico*, 462 U.S. at 564.

## IV. ANALYSIS OF THE MULTISTATE TAX COMPACT AS A COMPACT REQUIRES ITS CONTRACTUAL NATURE TO PREVAIL

The Appellees' contention that the Compact does not appear to be a truly binding contract/compact, Appellees' Brief at 45–55, is wholly at odds with the Supreme Court's construction of the agreement in *U.S. Steel*. It is beyond cavil that in *U.S. Steel*, 434 U.S. 452, the Supreme Court determined that the Compact displayed indicia of an interstate compact, and that the only issue was whether congressional consent was required. *Id.* at 473 ("the

20

test is whether the Compact enhances state power quoad the National Government").

In effect, the trial court and Appellees treat the Compact as a uniform law that Texas and other states have enacted. Based upon the Compact's terms, as interpreted by *U.S. Steel*, the conclusion is unavoidable that the Compact is, as the Supreme Court declared, an interstate compact, just one for which congressional approval is not required under the Compact Clause. Most telling, the Supreme Court would not have had to address the Compact Clause if it only treated the Compact as a uniform law.

The Compact is not a mere "uniform law," which the legislature is free to amend unilaterally at any time it wishes to do so. Buenger & Masters, *supra*, at 94. As is the case with other compacts, the Compact is not subject to unilateral amendment by a state. Once enacted, a state that wants to avoid its contractual obligations can only do so by repealing the compact in accordance with Article X of the Compact. Indeed, the very existence of a withdrawal provision suggests that the compact is much more than a uniform law, because uniform laws uniformly do not contain withdrawal provisions. Uniform laws do not need withdrawal provisions because states may freely enact, amend, or repeal uniform laws at any time.

21

*U.S. Steel* explicitly categorizes the Compact as a compact and determined that "agreements and compacts" are virtually indistinguishable under the Compact Clause in its analysis of the congressional consent requirement, stating,

> Appellants describe various Compacts . . . and attempt to show that they are similar to the [Multistate Tax] Compact before us . . . These other Compacts are not before us. We have no occasion to decide whether congressional consent was necessary to their constitutional operation, nor have we any reason to compare those Compacts to the one before us.

434 U.S at 473, n.24 (emphasis added).

Thus, the Compact's terms, are both binding contracts and statutory obligations among the member states. Texas and the other parties to the Compact may not claim that they can properly repeal the Article III election by their own unilateral actions. To do so, the states, acting collectively, must amend the Compact, such that Article III would no longer be any part of the states' agreement. They have not done so. The following states explicitly continue to include Articles III(1) and IV(9), as originally enacted in relevant part, in their codes:

- Alaska. Alaska Stat. § 43.19.010.
- Hawaii. Haw. Rev. Stat. § 255-1.
- Idaho. Idaho Code Ann. § 63-3701.[4]

---

[4] *But see* Idaho Code Ann. § 63-3027 ("Notwithstanding the election allowed in article III.1 of the multistate tax compact enacted as section 63-3701, Idaho Code, all business income shall be apportioned to this state under subsection (j) of this section by

22

- Kansas. Kan. Stat. Ann. § 79-4301.
- Missouri. Mo. Rev. Stat. § 32.200.
- Montana. Mont. Code Ann. § 15-1-601.
- New Mexico. N.M. Stat. Ann. § 7-5-1.
- Washington. Wash. Rev. Code § 82.56.010.

Texas courts have not hesitated to acknowledge the contractual nature of the State's obligations created by other interstate compacts and have ordered that the terms of such statutory agreements must be followed as "ministerial acts." *See In re Texas*, 97 S.W.3d 744, 746 (Tex. App.—El Paso 2003, no pet.) (Interstate Compact for Juveniles); *Ex Parte Cantrell*, 362 S.W.2d 115 (Tex. Crim. App. 1962) (Adult Parole and Probation Compact). The Court should similarly hold the state to follow the express terms of the Compact.

Appellees also incorrectly argue that they are bound to apply Texas' internal law and authorities. Appellees' Brief at 60–62. In *Dyer*, Justice Jackson concisely stated the problem with this argument.

> West Virginia officials induced sister States to contract with her and Congress to consent to the Compact. She now attempts to read herself out of this interstate Compact by reading into her Constitution a limitation upon the powers of her Governor and Legislature to contract.

---

multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus two (2) times the sales factor, and the denominator of which is four (4), except as provided in paragraph (2) of this subsection.")

341 U.S. at 35 (Jackson, J., concurring). Texas seeks to read herself out of the Compact Article III election, in direct conflict with what the Supreme Court concluded states could not do. Appellees seek to avoid this maxim, arguing that *Dyer* "has been cabined to compacts requiring congressional approval." Appellees' Brief at 64. Appellees are incorrect. Appellees' citation to note 23 in *U.S. Steel* has nothing to do with limiting the application of *Dyer*. Rather, that note only responds to the *U.S. Steel* appellants' argument that Justice Frankfurter's opinion in *Dyer* stated that all compacts require consent. There is no functional distinction between the Compact here and the Ohio River Valley Compact in *Dyer*.

Appellees also incorrectly argue that the Compact is ambiguous because the Compact does not explicitly prohibit a member state from "opting out" of Compact provisions by changing their own laws. Appellees' Brief at 55–60. The Appellees cite *Tarrant Reg'l Water Dist. v. Hermann*, 186 L. Ed. 153 (2013) for the Court's statement that course of conduct is highly significant in interpreting an interstate compact. However, the Compact is not silent; Article III expressly requires the election. There is no ambiguity here, and thus no need to "interpret" the Compact.

This argument also conflicts with established interpretive principles relating to statutory silence. The U.S. Supreme Court periodically discusses

24

the significance of silence in statutory text, often cautioning against gleaning meaning from silence. For example, in *Burns v. United States*, 501 U.S. 129 (1991), the Court stated,

> As one court has aptly put it, "[n]ot every silence is pregnant." *State of Illinois Dept. of Public Aid v. Schweiker*, 707 F. 2d 273, 277 (CA7 1983). In some cases, Congress intends silence to rule out a particular statutory application, while in others Congress' silence signifies merely an expectation that nothing more need be said in order to effectuate the relevant legislative objective. *An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent.*

*Id.* at 136 (emphasis added). Here, the silence that the Appellees suggest conflicts with the express language of Article III, which states, "Any taxpayer . . . may elect . . ." The compact does not need to prohibit the states from disallowing the Article III election when Article III expressly requires the states to allow it.

In addition, the Appellees' citation to *Tarrant* for one interpretive principle also does not fully explain all of the contract principles that courts use to interpret compacts. For example, courts can consider negotiation history (*see Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991)) and usage of trade in the form of considering other compacts (*see Alabama v. North Carolina*, 560 U.S. at 341–42; *Texas v. New Mexico*, 462 U.S. at 565).

The Appellant has briefed the development of the Compact and its relevant documentation at the time the states negotiated the Compact as to the intent of the drafters to offer the election to the taxpayers, Appellant's Brief at 1-14, and this brief does not repeat those points. Considering the "usage of trade" principle, courts do not treat "silence" as license to apply state law that conflicts with a compact. Only two cases in the nearly 200 years of compact jurisprudence have done so, but neither are good law—one was effectively overruled a short time later, and the other was based on faulty reasoning—contradicting the authority it cited as support. The first case, *Colburn*, 310 U.S. at 431,[5] did not last long. Eleven years later, in 1951, the Supreme Court issued its strongly worded decision in *Dyer*, 341 U.S. 22, which held that West Virginia's State Auditor could not rely on a provision in the state constitution to avoid paying West Virginia's share of the administrative expenses of the Ohio River Valley Water Sanitation Compact as required by the compact. Although *Dyer* did not involve the interpretation of "silence" or expressly overrule *Colburn*, the decision cast significant doubt about a state applying its own law (and constitutional

---

[5] *Colburn* is most often cited for the proposition that construction of a compact that has received the consent of Congress presents a federal question that the Supreme Court may review.

limitations) to a compact, and *Colburn* has never been cited as authority for applying state law where a compact is silent.

The other case, *Skamania County v. Woodall*, 16 P.3d 701 (Wash. Ct. App. 2001) involved a question of applying state common law to a compact. The Washington Court of Appeals held that the compact agency needed to apply state common law when interpreting a local ordinance required by the compact because the compact did not expressly reject that common law. For support, the court cited *Seattle Master Builders*, 786 F.2d at 1371, which stated, "A state can impose state law on a compact organization only if the compact specifically reserves its right to do so." The Washington Court of Appeals' holding presumed state law applies, which was contrary to the authority it cited, which established a presumption that state law does not apply. This contradiction suggests that *Woodall* is just an anomalous misunderstanding, and, like *Colburn*, it has never been cited as authority for applying state law where a compact is silent about applying state law.

At base, the Appellees are arguing that an express compact term is *a priori* ambiguous if there is no corresponding term also expressing the negative of that express term. This argument leads to the absurd result that every compact term would need to expressed twice—once to state what the term requires and then again for what the term prohibits. In more than 200

27

years of compact drafting, no compact has ever been written in this manner and there is no statutory or contract construction principle that suggests this manner of drafting is any more clear than simply providing a clear express term. The legal principle is clear and well established. Where there is an express term, silence cannot create an ambiguity just so a party state may employ interpretive tools such as "course of conduct" to try to defeat that express term.

Appellees also argue that the Compact does not supersede conflicting Texas law because the Compact does not expressly state that it supersedes conflicting state law. Appellees' Brief at 53. The only exception to the general principle that member states cannot unilaterally impose individual state law on a compact or a compact-created commission is a compact which specifically reserves to the member states the authority to impose individual state law in an area governed by a compact. *See Seattle Master Builders*, 786 F.2d at 1371; *Cal. Dep't of Transp. v. City of S. Lake Tahoe*, 466 F. Supp. 527, 537 (E.D. Cal. 1978) (application of state law to a bi-state entity is "precluded unless the Compact reserves . . . the right to impose such requirements."). Thus, whether or not the compact says so, a state may not override a compact term with subsequent legislation unless the compact reserves the right to do so. Again, silence creates neither a presumption that

28

such a prerogative exists nor an "ambiguity" as to whether there is such a reservation of rights. *See* Broun, *supra*, at 19, 24.

By way of example, of the five different compacts addressed in the five cases discussed in Section III.B, *supra*, only one of those compacts (the Driver's License Compact) contains a provision specifying the relationship between the compact and conflicting state law, yet in every one of the five cases, the courts concluded that the compact prevailed over conflicting state law. In addition, as discussed above, there have only been two cases in the entire history of compact jurisprudence in which a court has concluded that state law applies unless specifically rejected by a compact; one case was quickly overruled, and the other misapplied the prior case law that it claimed to follow. Although courts may use variable language, the basic and uniformly applied rule is that conflicting state law may only apply when the compact specifically preserves it.

## V. THE DECISION OF THE TRIAL COURT SERIOUSLY UNDERMINES THE ENFORCEMENT OF OTHER COMPACTS ENACTED BY TEXAS

The lower court's decision and the Appellees' arguments not only ignore the Appellant's interests but upset the delicate balance established within the entire system of administrative and regulatory compacts, negotiated by and between the states as sovereign entities. Contract law,

29

unlike regular statutory interpretation, has a clear and generally accepted purpose to foster the voluntary agreements of parties by enforcing norms and protecting expectation interests. *See, e.g.*, Randy E. Barnett, *A Consent Theory of Contract*, 86 Colum. L. Rev. 269 n.153 (1986) ("the purpose of contract law is to support the practice of undertaking voluntary obligations."); Alan E. Garfield, *Promises of Silence: Contract Law and Freedom of Speech*, 83 Cornell L. Rev. 261, 299 (1998) (contract law seeks to "protect the reasonable expectations that the parties will perform a contract."). Because compacts are also contracts, the courts should protect the *expectation* interests of the compact states when it interprets and applies compact provisions. This is even more appropriate for interstate compacts than contracts between private parties; again, the Eighth Circuit's apt description of compacts explains why.

> While a common law contract directly affects only the rights and obligations of the individual parties to it, an interstate compact may directly impact the population, the economy, and the physical environment in the whole of the compact area. A suit alleging that a state has breached an obligation owed to its sister states under a congressionally approved interstate compact also raises delicate questions bearing upon the relationship among separate sovereign polities with respect to matters of both regional and national import.

*Entergy*, 358 F.3d at 542 (citations omitted).

The failure of both the trial court and Appellees to recognize such expectations substantially impairs the stability and uniformity upon which

compact member states rely, including compliance and enforcement of their obligations. The decision below also significantly diminishes the proper authority of interstate compacts, as well as their unique role in state-federal relations. The Compact Amici have a vested interest in this matter given that the lower court's decision effectively allows Texas, or, by extension of its logic, any other compact member state unilaterally to contravene the uniform requirements of not just the Compact but other interstate compacts which Texas has enacted. This impermissible allowance of a unilateral amendment of the terms of an interstate compact by one member state has serious implications not only for the Appellant, but also for the other interstate compacts represented herein and other compacts across the nation, whose authority to regulate both juvenile offender transfers and child welfare placements is dependent upon the validity of compact law.

## VI.  CONCLUSION

The lower court's failure to apply settled principles of compact jurisprudence has resulted in an erroneous decision that, if left in place, improperly allows Texas to unilaterally avoid its obligation to provide taxpayers a choice with respect to electing a different apportionment formula as a matter of right. Even if Texas intended to supersede the uniform apportionment formula provided under the compact, it could not do so by

31

unilaterally enacting a conflicting statute and instead was required to directly repeal the Compact. This decision not only prevents the Appellant of availing itself of the option which the Compact was specifically enacted to provide but it undermines the authority of other legislatively approved compacts to which Texas and all other states are members. As a result, Amici join the Appellant in requesting that the decision of the trial court be reversed, and that the District Court be directed to enter summary disposition in favor of Appellant.

RESPECTFULLY SUBMITTED this 7th day of May, 2015.

_/s/ Richard L. Masters_
RICHARD L. MASTERS
(Kentucky State Bar No. 44606)


_/s/ Jeffrey B. Litwak_
JEFFREY B. LITWAK
(Oregon State Bar No. 973170)


ATTORNEYS FOR AMICI CURIAE
INTERSTATE COMMISSION FOR
JUVENILES & ASSOCIATION OF
COMPACT ADMINISTRATORS OF
THE INTERSTATE COMPACT ON
THE PLACEMENT OF CHILDREN,
AND JEFFREY LITWAK

## CERTIFICATE OF COMPLIANCE

This computer-generated document created in Microsoft Word complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 6842 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1). In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

_/s/ Richard L. Masters_
Richard L. Masters


_/s/ Jeffrey B. Litwak_
Jeffrey B. Litwak

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Amici Curiae Brief of The Interstate Commission for Juveniles, The Association of Compact Administrators of the Interstate Compact on the Placement of Children, and Jeffrey Litwak, In Support of Appellant has been electronically filed and served on all counsel below on May 7, 2015.

Rance Craft
Assistant Solicitor General
Rance.Craft@texasattorneygeneral.gov
Cynthia A. Morales
Cynthia.Morales@texasattorneygeneral.gov
Assistant Attorney General
**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-2872
(512) 474-2697 fax

ATTORNEYS FOR APPELLEES


Amy L. Silverstein
asilverstein@sptaxlaw.com
**SILVERSTEIN & POMERANTZ LLP**
12 Gough Street, #2
San Francisco, California 94103
(415) 593-3502
(415) 593-3501 fax

ATTORNEY FOR APPELLANT

James F. Martens
jmartens@textaxlaw.com
**MARTENS, TODD, LEONARD, TAYLOR & ALRICH**
301 Congress Avenue, Suite 1950
Austin, Texas 78701
(512) 542-9898
(512) 542-9899 fax

ATTORNEY FOR APPELLANT


*/s/ Richard L. Masters*_____
Richard L. Masters

*/s/ Jeffrey B. Litwak*_____
Jeffrey B. Litwak